**SO ORDERED.**

**SIGNED this 27 day of March, 2008.**

_____
**Randy D. Doub
United States Bankruptcy Judge**

_____

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
WILSON DIVISION**

| | |
|---|---|
| IN RE: | CASE NO. |
| **SMITH HOTEL PROPERTIES, LLC** | **08-01618-8-RDD** |
| DEBTOR | |

**ORDER CONDITIONALLY ALLOWING MOTION FOR TURNOVER OF PROPERTY
AND DENYING MOTION TO EXCUSE RECEIVER'S COMPLIANCE**

This matter is before the court on the debtor's emergency motion for use of cash collateral and motion for turnover of property and on the motion of BRT Funding, LLC to excuse the receiver's compliance with the requirements of 11 U.S.C. § 543(a) and (b). A hearing was held in Greenville, North Carolina on March 18, 2008 and March 20, 2008.

The debtor filed a petition for relief pursuant to chapter 11 of the Bankruptcy Code on March 7, 2008. The debtor owns a hotel in Goldsboro, North Carolina. The debtor purchased the hotel in February 2007 for $1,600,000.00. The debtor borrowed $1,350,000.00 from BRT Funding, LLC ("BRT") in order to complete the purchase. On January 29, 2008, BRT obtained an ex parte order appointing a receiver in state court to manage the hotel and the debtor was removed from the property. The appointment of the receiver precipitated the debtor's motion for turnover and BRT's motion to

excuse the receiver's compliance with the requirements of 11 U.S.C. § 543(a) and (b).  A foreclosure sale of the debtor's property was conducted on February 29, 2008, which resulted in a bid of $800,000.00 by BRT.  The chapter 11 petition was filed during the 10-day upset bid period.

Mr. Andy Simasek testified that he is employed by Newport Hospitality Group ("Newport"), a management company which handles the third-party management of hotel properties, as a vice-president and regional manager.  He indicated that he had been employed with Newport for approximately fifteen years, and had been in the hotel business since 1978.  In his capacity with Newport, Mr. Simasek has been associated with Choice Hotels ("Choice"), with whom he has worked for approximately 15 years.  He has served on the owners' council and numerous committees of Choice and has chaired its regional advisory board.

Mr. Simasek testified that he is familiar with the subject property of the debtor.  He indicated that Newport is the receiver appointed by the state court for this property, the exact entity appointed being Newport Longhill Services, LLC.  As individual receiver for Newport, he took possession of the hotel on the date the order was filed, January 29, 2008.  BRT Exhibit D.  He indicated that he first saw the property about a week and a half prior to his appointment as receiver.  Mr. Simasek explained that he had been involved with that particular property at different times for almost thirty years.  At the time he took possession as receiver, Mr. Simasek indicated that there were problems with the condition of the property, including cleanliness issues, maintenance issues, curb appeal, disrepair of many rooms, 15 rooms being out of order, problems with the operation of the washing machines and dryers, inoperable locks and an inoperable swimming pool.

Mr. Simasek also indicated that there were problems with the finances of the hotel at the time he took possession.  He found several vendors had not been paid.  An electricity notice was received

shortly after he took possession, and one of three electric meters had been turned off. He indicated that there were reports of payroll checks being returned for insufficient funds, but he did not have personal knowledge of these incidents. Mr. Simasek also found that one maintenance person employed by the hotel was an illegal immigrant, who was being paid off the payroll. That employee was dismissed. At the time he took possession, Mr. Simasek contacted the bank of the debtor in order to take control of the accounts. At that time, there were only a few hundred dollars deposited in the debtor's account. Because there were eleven days of payroll unfunded at the time he took possession, Mr. Simasek sought assistance from BRT to fund that payroll, which it did. BRT loaned the receiver more than $15,000.00 to make payroll and to make the utility payments. In addition to this assistance, Mr. Simasek testified that it was his understanding that BRT also paid the property taxes for the hotel property in January in the amount of approximately $14,800.00.

As to the condition of the manager's office, Mr. Simasek testified that he found the office to be in a state of disarray. He indicated that the office was cluttered, with a lot of mail and other paperwork stacked upon the desk. There were also computer parts and maintenance items in the office. There was a working computer and printer available in the office, as well.

Mr. Simasek was next presented with two reports of inspections performed on the hotel prior to his taking possession. BRT Exhibit G. The first inspection was performed on June 27, 2007, and the second on September 13, 2007. Mr. Simasek explained that a quality assurance inspection is a part of almost any franchise. If a hotel fails the inspection, there is generally a re-inspection within 30 to 60 days to determine if the deficiencies found during the initial inspection have been corrected. Mr. Simasek testified that the inspection reports for the subject hotel indicated a score of 90% on cleanliness in June 2007, but a score of only 79% on the re-inspection in September 2007. Mr. Simasek indicated

that, when he took possession of the property, the deficiencies noted on the inspections had not been corrected, but had actually grown worse. Based upon the inspections, Mr. Simasek testified that Choice would not move forward with such a hotel without a product improvement plan ("PIP"), which occurs any time a hotel changes ownership of its license. At the time of transfer of ownership, the parent hotel has the right to request that the new owner bring the property up to current standards, even though the property may have been grandfathered in under the prior owner. The PIP lists all items which would need to be cured or brought up to current standards. In his opinion, Mr. Simasek indicated that this property would need a substantial capital contribution in order to be brought up to current standards.

     Mr. Simasek next reviewed a notice of default sent to the debtor in December 2007. BRT Exhibit H. This notice reflected that the default of the franchise agreement was because of the debtor's failure to pay franchise fees, reservations assessments, marketing assessments, and not reporting the gross revenues to the franchisor. Mr. Simasek indicated that it was his understanding that the franchise agreement was suspended in September 2007, briefly reinstated, and suspended again in December 2007. Although the franchise agreement is currently terminated, Mr. Simasek, as receiver, has entered discussions with Choice regarding the reinstatement of the franchise agreement. He has requested reinstatement as a Quality Inn, or in the alternative, as a Roadway franchise. He indicated that the most recent response from Choice was that BRT could not be given a franchise license so long as Smith is still the owner of the hotel. Because of this position, the hotel currently has no access to a reservation system, which typically contributes between 20 and 25% to the hotel's occupancy rate. The current occupancy rate of the hotel is approximately 30%. Mr. Simasek indicated that because of the current state of the hotel, it is not cashflowing at present.

As receiver, Mr. Simasek indicated that his first priority was to get the hotel into the best condition possible with the limited funds available. Therefore, for the past thirty days, the employees have been cleaning rooms, shampooing carpets, cleaning walls and bathrooms, and moving furniture. Mr. Simasek referred to a report provided by the current manager regarding repairs made to the property by the receiver. BRT Exhibit J. With the approach of spring, Mr. Simasek testified that it is his hope that the hotel will soon be operating in a break-even position. Mr. Simasek indicated that the hotel currently has cash on hand of approximately $12,000.00. However, the monthly obligations for operations are approximately $15,000.00, with a payroll due on March 21, 2008 in the amount of approximately $10,000.00. With this cash flow, Mr. Simasek indicated that it would not be possible to continue to operate and to pay all taxes, insurance, and make payments to BRT to cure the default owed to it.

During cross-examination, Mr. Simasek explained that Mr. Dale Wrenn is currently the property manager of the hotel, and that he lives on-site in one of the hotel rooms. Mr. Simasek indicated that he had only been at the hotel on 3 occasions since he was appointed receiver, and that he spent approximately one hour there on each visit. He testified that, although he is not personally at the hotel on a regular basis, he receives reports and observations from others who are. Although Mr. Simasek indicated the problems he found upon taking over the hotel, he admitted that he had yet to have the washing machine repaired and that he had not received any estimates for having the swimming pool repaired. He indicated that the estimate received and shared by Mr. Smith, principal of the debtor, to have the pool repaired was in the amount of approximately $80,000.00. There has also not been any inquiry regarding payment of the repairs by the party causing the damage or by the hotel's insurance carrier.

Mr. Simasek further testified that he was not aware what amount, if any, of the taxes and insurance paid by BRT on behalf of the hotel came from amounts escrowed from the payments made by the debtor.

Mr. Simasek also indicated that he was not present at the time the inspections were performed and that he did not know the inspectors who had conducted the inspections. He also admitted that he did not know the details regarding the various scores given or why they were given.

Mr. Simasek admitted that he was not aware of the exact date that the franchise agreement with Choice was terminated, believing it occurred prior to his being appointed receiver. However, the agreement was actually terminated on February 7, 2008, which was after Mr. Simasek took possession.

Mr. Simasek indicated that he did not see evidence of any advertising or outside sales efforts by the debtor. In his opinion, it seemed that the hotel had been relying heavily on the franchise for marketing. He indicated that he did use the sign out front to advertise for a free breakfast in order to attract customers.

Upon questioning by the court, Mr. Simasek indicated that the hotel would only be allowed to reinstate its relationship with Choice upon payment of all amounts owed, which is currently approximately $62,000.00. He also indicated that Choice had allowed a variance to the receiver to continue the use of the Choice trademarks until an agreement could be reached between Choice and the receiver after the outcome of the hearing on the pending motions.

Mr. Henry Staley, Jr. testified that he is employed by Atlantic Hospitality Advisers ("Atlantic"), a company which does appraisals and feasibility studies for hotels. He testified that he is MAI certified

and that he has appraised over 1000 hotels during his career, more than 100 of which have been in North Carolina.  However, Mr. Staley admitted that he had never before appraised a hotel in Goldsboro, North Carolina.

Mr. Staley testified that he is familiar with the subject property.  His partner, Mr. Tony Jenkins, spent two days gathering information, inspecting the subject property, and gathering economic and demographic data in order to perform a valuation of the property.  Mr. Staley spent two days doing sales comparison analysis, and then spent one day compiling information and determining a value with Mr. Jenkins.

Mr. Staley indicated that the valuation of the property depends upon the type of hotel situated upon it.  Profitable hotels are valued differently than distressed properties.  Mr. Staley classified the subject property as distressed, as it has only a 30% occupancy rate and did not produce cash flow.  Therefore, the subject property was compared to like properties in like markets throughout the country.  Using the Star Reports generated by Smith Travel Research, Mr. Staley compared the subject property to other properties within its competitive set.  This property was analyzed under both the sales comparison and multiple of room revenue approaches, which yielded a value of $1,400,000.00.

On cross examination, Mr. Staley admitted that he was engaged to conduct the valuation on March 12, 2008, one week prior to the hearing of this matter.  He indicated that he and Mr. Jenkins had put in a combined time of at least 50 hours studying the property and preparing the valuation.  In addition to that, they would probably put another 30 hours into writing the report on the valuation.

Mr. Staley indicated that, had he possessed the profit and loss statements of the hotel, he would have reviewed that information in determining the valuation, but he did not have access to those documents.  He further indicated that historical operating data from a prior owner would have been

7

helpful, but he had not reviewed that information either. He indicated that the sales price of the hotel in February 2007 would not have affected his opinion regarding its current value.

Like the subject property, Mr. Staley testified that the comparables used were not full-service hotels with restaurants. Several were built during the same timeframe as the subject property.

Mr. Staley indicated that, if the restaurant brought in enough revenue to be considered profitable to a degree that would set off the other operating expenses of the company, that revenue would be relevant to the valuation. However, he indicated that he would be surprised if that revenue were meaningful in this particular situation. He therefore listed revenue other than room revenue at between $50,000.00 and $75,000.00 per year, as he did not have access to the actual numbers.

Mr. Walter Smith, sole member of the debtor, testified that he had worked in the hospitality industry since 1995. He worked at the subject property, when it was a Holiday Inn, from 1995 until 1998. He then worked at a Best Western in Charlotte for over a year as director of operations. He then worked at Best Western in Raleigh, with a brief interruption during which time he served as assistant manager of a property in Winston-Salem. He returned to Best Western in Raleigh to serve as general manager from 2002 until November 2004. In November 2004, he returned to the Quality Inn and Suites in Goldsboro as general manager. At that time, the hotel was owned by GTW Hotels, Inc.. Mr. Smith entered into an agreement with Mr. Mike Geisler, owner of GTW, to purchase the property at a reduced rate if he could make the property profitable. During his term as general manager, Mr. Smith testified that he signed checks, made work schedules, checked rooms, oversaw renovations, ordered supplies, paid bills, oversaw a $1,000,000.00 credit line, and handled some things for other hotels owned by GTW with inexperienced managers. He estimated that he worked 65 hours per week as general manager. During that time, Mr. Geisler visited the property one to three times per year.

When Mr. Smith purchased the hotel, he made a down payment of $240,000.00 and paid up-front fees of approximately $30,000.00, including fees to BRT. He gave a second lien deed of trust to Mr. Geisler in the amount of $80,000.00, which is still outstanding. Since purchasing the property, Mr. Smith estimates that he has contributed $125,000.00 of his own money toward upgrades and supplies.

Prior to closing the pool for the year in 2006, Mr. Smith had the Wayne County Health Department inspector inspect the pool. He was told that, prior to reopening in 2007, the pool must be repainted, resurfaced, and restriped. The inspector suggested a company to do the work. In April or May 2007, Mr. Smith hired that company to do the required work. The company drained the pool and painted it, but they failed to properly secure the pool, and after a one and one-half day storm, the pool was pushed out of the ground because the draining water had no place to go. The contractor claims that he has no insurance to cover the cost of repairs to the pool because the damage was caused by an act of God. Mr. Smith hired East Coast Pools to determine the necessary steps and cost for having the pool repaired. East Coast provided an estimate to Mr. Smith, but he was unable to complete the repairs after hiring East Coast to perform the estimate because of the dispossession by the receiver. Mr. Smith testified that he believes that his insurance will cover the cost of repair.

Mr. Smith testified that, prior to his dispossession from the property, he received notice from the insurance company of the pending cancellation of coverage for the hotel. Upon receipt of the notice, he contacted the insurance company and made payment over the phone. However, BRT had also made payment upon receipt of the notice, and the amount paid by the debtor was refunded into its account. Mr. Smith testified that insurance had never lapsed on the hotel during his management and ownership, and that the hotel is currently insured until January 2009.

In response to Mr. Simasek's testimony regarding payroll checks being returned for insufficient funds, Mr. Smith testified that several of his employees cashed their payroll checks with entities that held the checks for long periods of time. When the checks were later presented for payment, other expenses had been paid out of the checking account, causing there to be insufficient funds to cover the checks at that later date. Mr. Smith indicated that he would not have been able to keep his employees if he had been bouncing their payroll checks.

Mr. Smith admitted that he did not make his November 2007 and December 2007 payments to BRT. He indicated that the reason he missed the payments was because he was in the middle of seeking a refinance of the full amount of debt owed. The refinancing of the debt required a lot of up-front costs, which depleted the debtor's funds. Mr. Smith testified that he had been working with two different companies regarding the refinance. He indicated that one of the refinance companies would have given him an additional ten days to work out the agreement, but BRT would not give the debtor an extension unless Mr. Smith waived his rights to file bankruptcy if the refinance did not go through.     Mr. Smith testified that, at the time of the 2007 inspections, Choice had outsourced its inspections to LRA. Prior to that, Choice Hotels conducted its own inspections. When LRA took over the inspections, their standards were more stringent. Mr. Smith testified that the Wayne County Health Inspector had inspected the hotel on January 2, 2008, at which time the hotel received a 95% score. The inspector indicated that much of the carpet had been replaced, dyed or cleaned. There was no deduction for rooms, walls, or ceilings, as they were in good repair and clean. The inspector did take deductions for chips in sinks and for a couple of cigarette burns. There were also a couple of areas that the inspector indicated needed some cleaning and vacuuming. The inspector also deducted points for the hot water being too hot and for towels not being removed from the back of a couple of bathroom doors. After reviewing the

receiver's list of improvements and cleaning that needed to be done when he took possession on January 29, 2008, Mr. Smith testified that the items on that list were not addressed by the health department inspector.

      Mr. Smith next addressed the list of improvements and cleaning prepared by the receiver. BRT Exhibit J. In response, he indicated that about $2000.00 worth of cleaning supplies were delivered on the date on which the receiver took over. He indicated that there was no need to clean the walls on a daily basis. The floors were cleaned daily, as were the mirrors and windows inside the rooms. The outside windows were cleaned on a rotating basis. Mr. Smith admitted that his office was cluttered, but he indicated that is the way he operates. As to the items relating to the kitchen, Mr. Smith admitted that the health inspector had requested that the hood be cleaned in November 2007. He indicated that the grills, fryers, and burners were cleaned regularly and that the walls were pressure washed regularly. In the bar area, Mr. Smith testified that the vents were out and the bar was down at the time of the dispossession because renovations to that area were not complete. Although there had been problems with one of the dryers, Mr. Smith testified that he had just purchased a new one with twice the capacity of the old one, and that he had no knowledge of the dryers not sufficiently drying the linens. He indicated that he knew the washing machines were old and that they were constantly having problems with them, but that he was used to dealing with those problems. He indicated that he had just had the ballroom and boardroom carpets cleaned in December. The lock batteries give no indication that they are going dead until the lock will no longer work. They are changed upon notification by guests that they are inoperable. Mr. Smith indicated that he did not know about commodes and sinks running, but that the hotel had parts available to remedy those, as they occur often. As to the windows and door that were broken out, Mr. Smith testified that occurred after he was dispossessed. He indicated that the

11

furniture was moved and polished quarterly and the mattresses were flipped regularly. Mr. Smith explained that Mr. Anthony Faison, one of the maintenance employees, had been mowing the grass during the off-season in order to earn some additional money. He chose to use his riding lawnmower, which had been replaced by a push mower purchased by the receiver. Trash was picked up from the woods and parking lots regularly. The trash cans were washed out regularly, even though the trash can wash station was inoperable because of the renovations to the bar area.

With regard to the appointment of the receiver, Mr. Smith testified that he never received a copy of the complaint filed in Wayne County or a copy of the notice of hearing set for January 29, 2008. Mr. Smith never saw these documents until after he was dispossessed and made copies for himself at the courthouse. When questioned about service on February 6, 2008, Mr. Smith explained that he was not at the hotel at that time as he had been removed as manager, and Dale Wrenn was acting as manager at that time.

Mr. Smith testified that he has applied for a $2,100,000.00 refinance loan, which would be enough to cover the amounts owed to both BRT and Choice. However, it is important that he be in possession of the hotel in order to refinance.

Mr. Smith testified that he had an independent sales manager, Ms. Sheila Small, who assisted him with making sales calls when he was managing the hotel. Both Mr. Smith and Ms. Small would visit people in the Goldsboro area to advertise the services offered by the hotel, including banquets, catering, family reunions, wedding receptions, etc. He further indicated that this hotel is the only full-service hotel in Goldsboro, as the other two hotels with restaurants offer only a continental breakfast. Mr. Smith testified that Ms. Small has not been working with the receiver to promote the services of the hotel, but is willing to return if the debtor is returned to possession of the hotel.

Mr. Smith testified that his salary was $2,000.00 bi-weekly, but that he did not receive a salary if cashflow was not sufficient. In fact, he testified that from April 2007 until he was removed on January 29, 2007, he had only paid himself $4,000.00.

Mr. Smith explained that he had been using CLC, which is a central booking agency out of Kansas. This company makes arrangements for employees of companies to stay at hotels with the use of CLC cards. After the employee checks out, CLC deposits the money for the stay directly into the account of the hotel. Mr. Smith testified that this service provided increased revenue to the hotel. In addition, Mr. Smith testified that, at the time of his dispossession, he was in the process of negotiating a military contract for approximately $250,000.00 per year.

Mr. Smith discussed the 2004, 2005, and 2006 financial statements provided to BRT by Mr. Smith. Debtor's Exhibit 3. These financial statements indicate that the revenue received by the hotel was approximately $1,000,000.00 more than what the appraiser estimated for that three-year time period. These statements were also provided to the appraiser who conducted an appraisal of the property for Mr. Smith in June 2007. BRT Exhibit L. That appraisal valued the property at $3,500,000.00. Mr. Smith testified that BRT never conducted an appraisal of the property prior to making him the loan.

On cross examination, Mr. Smith admitted that the numbers in the financial statements given to BRT were not the same as the numbers provided by GTW to Choice Hotels. He explained that, at the instruction of GTW, he reported different numbers to Choice to keep from paying franchise fees. However, he indicated that, since becoming owner of the hotel, the numbers reported to Choice had been accurate.

Mr. Smith admitted that the room revenues dropped off after he became the general manager of the hotel in 2004. However, this drop-off was a result of the loss of a military contract by the hotel.

13

Mr. Smith testified that he has his personal money and a credit line which he could use for hotel expenses. He indicated that he would not have already invested as much of his personal money in the hotel if he did not intend on making it work. He estimated that it would take approximately $10,000.00 in cash to be prepared to start the operation back up.

Mr. Tony Jenkins, partner of Mr. Staley's, testified as an expert in hotel valuation and hotel management. He indicated that, after hearing the numbers provided by the debtor with regard to the hotel's food and beverage business, his opinion of the value of the hotel would not change because a purchaser would not consider the food sales in what they would be willing to pay for the hotel and because the expenses associated with food and beverage delivery would also need to be considered.

He indicated that in conducting his valuation of the property, he came to Goldsboro and spent time with the existing manager. He also inspected the property and interviewed locals with respect to other hotels in the area. Mr. Jenkins agreed with Mr. Staley that the debtor's hotel should be compared with other similar operating hotels, no matter where the location. Mr. Jenkins admitted that he had not asked BRT for any information in order to conduct his valuation of the property, but used statistics reported to Choice because he assumed those to be accurate. BRT Exhibit M. He indicated that he did not ask for statements of room revenues or for a profit/loss statement prior to valuing the hotel. Mr. Jenkins indicated that, after hearing Mr. Smith testify, he still would not reconsider his valuation of the property, as he did not consider Mr. Smith's testimony to be a credible rebuttal of the information gathered by him and Mr. Staley.

Mr. Jim Knerr testified that he is the corporate credit project manager for Choice Hotels. He testified that he had reviewed the records of the debtor which are kept in the ordinary course of Choice Hotels' business. Mr. Knerr acknowledged an email to Mr. Smith from Gery Brown which indicated

that the franchise could be reinstated in exchange for payment of one-half the amount owed at the time of the email, which was $21,000.00. BRT Exhibit N. Mr. Knerr testified that, although a check was sent by Mr. Smith four days later, prompting a rescission of the notice of termination, the check was returned for insufficient funds. BRT Exhibit O.

When questioned regarding the outsourcing of inspections to LRA, Mr. Knerr testified that LRA did not change how the reviews were done by Choice. He also indicated that other franchisees had no complaints regarding LRA and the scores received from it. On cross-examination, Mr. Knerr acknowledged that reviews are now done twice per year, as opposed to once per year and that the reviews are now outsourced instead of being done by an in-house employee. He also acknowledged that he had never been a quality inspector and was unaware of how the broad categories of inspection are interpreted by LRA.

Mr. Knerr acknowledged that it was very unlikely that the debtor would receive a new franchise agreement with Choice after his testimony regarding the alteration of numbers reported to Choice with regard to room revenues. However, Mr. Knerr did indicate that Choice has a committee which determines with whom franchise agreements are made, and he is not on that committee.

Pursuant to 11 U.S.C. § 543(d)(1), a court "may excuse compliance with subsection (a), (b), or (c) of this section if the interests of creditors and, if the debtor is not insolvent, of equity security holders would be better served by permitting a custodian to continue in possession, custody, or control of such property. As stated in Dill v. Dime Savings Bank (In re Dill), 163 B.R. 221, 225 (E.D.N.Y. 1994),

> A court considering whether to exercise its discretion under section 543(d)(1) may consider several factors indicative of whether the interests of creditors would be better served. These factors have evolved to include (1) whether there will be sufficient income to fund a successful reorganization; (2) whether the debtor will use the turnover property for the benefit of the creditors; (3) whether there has been mismanagement by

>the debtor; (4) whether or not there are avoidance issues raised with respect to property retained by a receiver, because a receiver does not possess avoiding powers for the benefit of the estate; and (5) the fact that the bankruptcy automatic stay has deactivated the state court receivership action.

(citations omitted).

In this case, the court finds the value of this real property based upon the evidence presented to be $1,650,000.00. The court further finds that the amount of debt in this case, by stipulation, is $1,513,358.00 on the first lien to BRT and $80,000.00 on the second lien to GTW. Therefore, as to the real property, the debtor is not insolvent. Considering the factors outlined by Dill, the interests of the creditors would be served along with the debtor in granting the motion for turnover and denying the motion to excuse the receiver's compliance. The court finds that, based upon the testimony presented, there will be sufficient income to fund a successful reorganization, as Mr. Smith has testified to his willingness to continue to make capital contributions to the debtor in order to fund a successful reorganization. Mr. Smith is aggressively pursuing a refinance of the property in the amount of $2,100,000.00. The court further finds that the debtor will use the property for the benefit of the creditors. The court finds that, although there may have been some mismanagement during Mr. Smith's tenure as the general manager of the hotel based upon his testimony of providing fraudulent room revenues to Choice during that time, there is no indication of further mismanagement since the debtor bought the property. The court finds that there is sufficient cause to give the debtor an opportunity to reorganize in chapter 11 under the following conditions.

Based on the foregoing, the debtor's motion for turnover is **ALLOWED** and BRT's motion for excusal of the requirements of § 543 is **DENIED**, upon the following conditions:

1. The debtor is to provide adequate protection to BRT by making monthly payments in the amount of $12,611.32, beginning April 1, 2008 and on the first day of each month thereafter until the plan is confirmed or until the automatic stay is lifted pursuant to any motion filed by BRT, whichever first occurs. If any adequate protection payment is not made by the 15th day of the month in which it is due, the automatic stay shall automatically lift as to BRT without further hearing.

2. The debtor must appear on Tuesday, March 25, 2008 in Wilson, North Carolina at 1:00 p.m. for a hearing on the debtor's emergency motion for use of cash collateral. If the debtor is successful at that hearing, then the court will set a date and time for turnover of the property to the debtor at that time.

3. The receiver is to make available to Mr. Smith all books and records of the debtor, as well as any other documentation necessary for his preparation for the hearing on March 25, 2008, on March 21, 2008.

4. All fees and expenses incurred by the receiver from the date of the filing of the petition until the date and time of the turnover of the property to the debtor will be paid as a cost of the administration of the debtor's estate after proper application to the court.

   **SO ORDERED**.

**END OF DOCUMENT**